## DEITRICK v. ULIN et al.

### No. 6979.

District Court, D. Massachusetts.

July 9, 1940.

Aldridge & Fisk and Brenton K. Fisk, all of Boston, Mass., for plaintiff.

David D. Kadetsky and Joseph B. Abrams, both of Boston, Mass., for defendant.

FORD, District Judge.

This is a suit, equitable in its nature, by a judgment creditor of the defendant Bessie R. Weinberg against the latter and the defendant Ulin, who is alleged to be liable to the defendant Weinberg as an indemnitor for a loss incurred by Weinberg as agent of Ulin in signing a note secured by a mortgage on real estate in Cambridge, Massachusetts, for a loan to her of $8,000 by the Boston National Bank, a predecessor of the Boston-Continental National Bank. The defendant Ulin in his answer, among other defenses, maintains that the defendant Weinberg was not his agent and, consequently, he was under no duty to indemnify her for any loss she suffered in the transaction.

### Findings of Fact.

The defendant Bessie R. Weinberg was named Kotzen before her marriage and signed the note in question as Bessie R. Kotzen. In the year 1926 she was employed by Samuel J. Aronson, now deceased, as a personal secretary and stenographer. Aronson was extensively engaged in the insurance and real estate business both personally and as a trustee of the Sumner Realty Trust and had offices located at 333 Washington Street, Boston, Massachusetts.

On February 13, 1925, one Mary Augenstern, a sister of the defendant Ulin, was record owner of a piece of real estate situated in Cambridge, Massachusetts, and on that date signed a quitclaim deed granting this real estate to the defendant Weinberg. No consideration was paid by the defendant Weinberg and the property was put in her name in order that she might later act as a straw for the owner in connection with its refinancing.

On May 20, 1926, this quitclaim deed was recorded in the Middlesex Registry of Deeds. There was no evidence in whose possession this deed was between the dates of February 13, 1925, and May 20, 1926, nor was there any evidence introduced in the case by the plaintiff as to the collection of rents, the making of repairs, or other acts from which ownership could be inferred, between those dates.

On May 19, 1926, the defendant Weinberg was requested by Aronson to sign a note and mortgage on this Cambridge property for $8,000 to the Boston National Bank. She testified that when she signed this note and mortgage, the defendant Ulin was present in Aronson's office and that Aronson asked her to sign the note "for Max" (the defendant Ulin).

The evidence showed that when the attorneys for the plaintiff in the present case were making an investigation as to the ownership of the above described property in 1935, the defendant Weinberg replied to questions as follows:

"Q. Where did Mr. Ulin get this property? A. I do not know. All I know is that Mr. Aronson once came into the office and said to sign this note for Max and I said 'all right'. He [Aronson] then said, 'I will give a second mortgage to Hattie' [Ulin's wife].

"Q. Did you have any talk with Ulin or Aronson in regard to this property? A. No, Mr. Aronson always called me Bessie. Mr. Aronson always said, 'Well, Bessie, you won't have to worry about anything you ever sign for me, because I am always good for it and I would never let you

suffer for anything you would sign for me.' "

After signing the note and mortgage at Aronson's request, she drew up and signed, also at Aronson's request, a second mortgage for $6,000 to Harriet T. Ulin, the wife of the defendant Ulin. The defendant Weinberg testified, and I find it to be a fact, that all the papers, the note and mortgage to the bank and the note and mortgage to Ulin's wife, were handed over on the same day, shortly after they had been prepared and signed, to Ulin, who proceeded to the bank where he received two checks, one for $3,940 and the other for $4,060, made out to Bessie R. Kotzen and dated May 20, 1926. At no time did the defendant Weinberg go to the bank. These checks were endorsed by the defendant Weinberg at Ulin's request. The check for $4,060 was used by Ulin at the Registry of Deeds to pay off a mortgage to which the Cambridge property was subject. The other check for $3940 the defendant Ulin deposited in his personal account with the United States Trust Company, a Boston bank.

The insurance on this property was placed by Aronson's office and made payable to the defendant Weinberg, the bank, as first mortgagee, and Harriet T. Ulin, as second mortgagee. Sometime later, a fire occurred and the defendant Weinberg visited the property accompanied by Ulin in order to estimate the loss. There was no evidence that Aronson collected any rents from the property. In fact, there was no evidence that anybody every collected any rents from the property. Aronson never kept any accounts in his office concerning this particular piece of property, although it was testified by the defendant Weinberg that accounts of rents collected by Aronson were regularly kept by her.

The evidence further showed that the defendant Weinberg was accustomed to act on different occasions as a straw for Aronson and others, at his request, in real estate dealings and she was experienced in drawing notes and instruments of conveyance. She admitted that in the transaction here in question she was acting as a straw. She further stated that on the occasions she acted as a straw in real estate transactions at the request of Aronson, she was doing "a favor" for the party for whom she acted. She was fully cognizant of what a straw was and the purposes for which a straw was employed in real estate transactions. The defendant Weinberg stated that at no time did she have any understanding with Ulin that she would be indemnified for any loss she suffered in the transaction with the bank, although it appears from her statement in 1935 that she did have some such standing understanding with her employer, Aronson.

The defendant Ulin has been a practising lawyer for 28 years and was very friendly socially with Aronson for a great many years. He had also acted as Aronson's attorney for some time preceding May 20, 1926. Ulin had acted as Aronson's attorney many times when the latter used the defendant Weinberg as a straw. Ulin further testified that the papers in the transaction here were drawn in Aronson's office and had been drawn when he first saw them; that he merely acted as attorney in the passing of the papers. He stated that he delivered the $3,940 check to Aronson, who requested the defendant Weinberg to endorse it, and that then Aronson delivered this check to Ulin in part payment of an open account which he had with Aronson. Ulin testified, and I find it to be a fact, that he was accustomed to make loans to Aronson in order to enable the latter to finance real estate dealings. Ulin deposited this check in his account, which the evidence showed in May, 1926, had a daily balance of from $2,000 to $6,000. Ulin denied emphatically that he owned the Cambridge property; that he ever collected any of the rents; that he exercised any control over the property. He stated that Aronson was the owner of the property and that he visited the property at the time of the fire to help his friend Aronson who was ill and out of town. Ulin denied that there was any request by Aronson that Weinberg sign the note in his behalf or that he was in Aronson's office when the note was signed. He stated that he never owned any real estate nor did he visit the bank at any time to negotiate the loan of $8,000. He testified, and there was no denial of the fact, that Aronson himself, personally or as trustee, at times owed the plaintiff bank as much as $200,000. He testified further, and I find it to be a fact, that he acted as attorney for Aronson on two occasions when the defendant Weinberg brought civil and criminal proceedings against her employer Aronson for moneys and stock certificates.

On October 9, 1935, the present attorneys for the receiver of the bank notified the defendant Ulin that it was in-

formed by the defendant Weinberg that "she was acting as your straw" and "I, accordingly, have been instructed to take action against you for the balance due." Later, suit was brought in June, 1936, against the defendant Weinberg alone and execution issued on February 25, 1937 in the amount of $5,960.70, which was inclusive of the balance due on the note, plus interest and costs.

On cross examination, Ulin admitted the property, before its transfer to Weinberg, was in his sister's name. He stated, and I find it to be a fact, that she was a close friend of Aronson and was merely acting as a straw. The bank introduced no evidence to show the manner in which Ulin's sister came into possession of the property. The evidence further showed that the second mortgage running to Ulin's wife was executed without her knowledge or consent.

### Conclusions.

The first question for decision in this case is whether the defendant Ulin was the owner of the property mortgaged to secure the note executed by the defendant Weinberg in favor of the bank and upon which she suffered the loss. If he was not, the defendant Weinberg was not his agent and the plaintiff cannot recover.

It is unfortunate that this matter dates back to the year 1926 in view of the character of the present controversy. I appreciate full well the difficulties that are met in the preparation of an old case, and surely enough we find lacking here evidence usually available that would aid in deciding this first and important issue of ownership which would establish whose agent the defendant Weinberg was, Aronson's, Ulin's, or a third party's.

As appears above, there was no evidence as to who negotiated the loan of $8,000 on the property from the bank; there was no evidence as to who made the payments on the note on account of principal and interest; there was no evidence as to who collected the rents, or made repairs, or exercised any of the usual incidents of ownership; there was no credible evidence as to who paid the insurance on the property, or the taxes; there was evidence that the insurance was placed in Aronson's office. There was no evidence as to circumstances under which Mrs. Augenstern, Mr. Ulin's sister, acquired the property and from whom. There was not even evidence as to the collection of rents when she held the property. Mrs. Augenstern did not appear as a witness; there was no evidence she was not available. It does seem that she could have aided in lifting the fog surrounding the ownership. No official or employee of the bank testified in this case; there was no evidence that they were not available. No books of the bank were presented. On the other hand, there is no evidence that the employees of the bank could aid the court on the question of ownership with any evidence in their possession. The usual probative details to determine such an issue as is involved here were entirely lacking.

■ The plaintiff, to prove ownership by Ulin, relies principally, outside of Weinberg's testimony, on the fact that the property before its conveyance to the straw Weinberg stood in the name of Ulin's sister; that a second mortgage was given to his wife to protect the equity and that Ulin deposited one of the checks received from the bank in his personal account. These facts together with the testimony of the defendant Weinberg herself, which was meager on the question of ownership, are practically all the evidence the plaintiff introduced. But is it enough? Weinberg has an interest here and some consideration must be given to the fact that she was not any too friendly disposed to the defendant Ulin because of his appearances against her in her criminal and civil proceedings against Aronson. Ulin's explanation that Mrs. Augenstern and his wife were acting as straws in these transactions is perfectly plausible in the absence of other controlling facts. Deposit of the check in his own account seems to be reasonably explained by the fact that Aronson owed Ulin sizeable amounts of money and part of the standing indebtedness was liquidated by this refinancing transaction. The plaintiff is called upon to prove his case by a fair preponderance of the evidence and I am unable to find he has sustained this burden. The testimony of the witness Weinberg set out verbatim above, on the whole, is confusing, but it may be pointed out that it was Aronson who said, "I will give a second mortgage to Hattie" —Ulin's wife. Further, the witness Weinberg said that she did not talk about the property with Ulin or Aronson. It is my belief, from Mrs. Weinberg's testimony, that she did not know who owned the property when she executed the note and mortgage to the bank and that later, for

some reason, she concluded and informed the attorneys for the bank that Ulin was the true owner and that she was acting as a straw for him. I find that she acted as a straw at the request of Aronson, as she had acted many times before, and that she gave scant attention as to whether Aronson, Ulin, or a third party was the real owner. And there is further evidence in the case that even the present attorneys for the bank did not regard her statement in 1935 that Ulin owned the property as any too convincing, in view of the fact that after they received this information from the defendant Weinberg and threatened Ulin with suit, they abandoned that course and brought suit against the defendant Weinberg herself. I make this inference in the absence of any evidence to indicate the contrary.

The defendant Ulin has been a reputable member of the bar for a great many years. He emphatically denied that he owned this property. I have no real reason to reject his testimony as untrue. It would require more evidence than the bank has produced here to warrant me in concluding he was the real owner. To do so would be tantamount to finding he committed perjury at the trial. He testified in a straightforward manner. It would be inflicting an unwarrantable injustice, in the light of the evidence here, to jump to the conclusion that he owned the property because it appeared in the name of his sister, or that his wife took back a second mortgage.

It is my conclusion in this case that the plaintiff has not sustained the burden of proving that Ulin was the owner of the property. Accordingly, the defendant Weinberg was not his agent when she allowed herself to be used as a conduit for the transaction with the bank and was entitled to no indemnity from him as principal, which the plaintiff can reach and apply to his judgment against Weinberg.

In addition, I want to point out that I have found there was no evidence, even though we assume that Ulin was the owner and she was acting for him, that there was any express understanding or agreement that she would be held harmless in this transaction. She knew what a straw in real estate transactions was from experience. The bank knew from all the circumstances that she was a straw. A "straw" is a conduit, usually an impecunious person who cannot respond in dam- ages to anyone and who ordinarily, for this reason, does not expect to be indemnified in the event he suffers a loss. Nor usually does a person who uses a straw in this type of transaction expect in any way to be personally liable. Cf General Laws of Massachusetts (Ter.Ed.), Chapter 107, Section 40. This is usually understood by all the parties concerned.

I do not here decide, however, whether the doctrine of the case of Evans, Coleman & Evans, Ltd. v. Pistorino, 245 Mass. 94, 139 N.E. 848, is applicable to a case of a straw and owner of real property in the event the straw suffers a loss under circumstances similar to those in the present case. Cf. Restatement, Agency, Section 438; Connolly v. Bolster, 187 Mass. 266, 72 N.E. 981; O'Connell v. New York, New Haven & Hartford Railroad Co., 187 Mass. 272, 72 N.E. 979.

Judgment may be entered for the defendants, without costs.